UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>EMILIO GARCIA<br><br>Defendant | Criminal No. 23-CR-10297-PBS |

**MEMORANDUM IN SUPPORT OF SENTENCING RECOMMENDATION**

The Defendant is responsible for manufacturing and distributing hundreds of kilograms of fentanyl and methamphetamine. Rare is the case in which a sentence of nearly twenty years is warranted when the Defendant promptly accepts responsibility and pleads guilty with no litigation. Rarer still is the case when nineteen years reflects considerable leniency. This is such a case.

The government submits this memorandum in support of its recommendation for **228 months of incarceration** for the Defendant, followed by five years of supervised release. This recommendation reflects the seriousness of the offense, the need for deterrence and punishment, and is sufficient but no greater than necessary to accomplish the goals of sentencing. The government's recommendation of 228 months reflects a sentence that is consonant with justice and accords with the sentencing factors under Section 3553(a).

**THE ADVISORY SENTENCING GUIDELINES**

The government notes that the Plea Agreement sets forth an offense level calculation of 39 (ECF #99). This is less than the calculation provided by U.S. Probation, which calculated the offense level in the final Presentence Report to be 43 (PSR ¶¶128-141). With an agreed-to criminal history score of nine, the criminal history category is IV (PSR ¶¶143-151). Therefore, the guideline sentencing range ("GSR") calculated by Probation is life in prison, followed by 60

months consecutive (PSR ¶¶193-196). The government objects to Probation's calculation to the extent it differs from that set forth in the Plea Agreement.

The offense level of 39 in the Plea Agreement and criminal history category of IV, results in a guidelines sentence of 360 months to life, followed by 60 months. The Plea Agreement entered into by the parties under Fed. R. Crim. P. 11(c)(1)(C) calls for a sentencing of not less than 204 months and not greater than 228 months. The agreed-to sentencing range is well-below the GSR both as calculated by the Parties and by Probation. The government requests that the Court impose a downward variance and sentence the Defendant to 228 months.

While a minor practical distinction, the government does object to Probation's calculation that increased the offense level by 4 beyond that found in the Plea Agreement. The distinction is comprised of Probation finding +2 for stash location (PSR ¶132), and +2 for engaging in the offense as part of a livelihood (PSR ¶133). The government objects to these enhancements being included in the Court's calculation of the PSR and will make oral argument against their application at sentencing.

## ARGUMENT

The Court must consider the factors set forth in 18 U.S.C. § 3553(a) in determining a sentence that is sufficient, but not greater than necessary, to comply with the purposes of sentencing set forth in § 3553(a)(2). Among those factors are the "nature and circumstances of the offense," promoting respect for the law, and providing just punishment. See 18 U.S.C. § 3553(a)(2)(A). The sentence must also afford "adequate deterrence" for both the defendant and others. See 18 U.S.C. § 3553(a)(2)(B) (the court may impose a sentence "to afford adequate deterrence to criminal conduct"). Lastly, the sentence must protect the public from the further crimes of the Defendant. See 18 U.S.C. § 3553(a)(2)(C) ("protect the public from further crimes

of the defendant"). Consideration of the § 3553(a) factors demonstrates that a sentence of 228 months is sufficient, but not greater than necessary, to meet the goals of sentencing.

       **A.**      **Nature and Circumstances of the Offenses**

As described in the presentence report, the Defendant led a drug trafficking organization ("DTO") that was responsible for distributing a truly astonishing quantity of controlled substances. The DTO controlled multiple locations, including a stash location and clandestine laboratory.

As the cooperating witnesses noted, multiple runners were employed by the DTO and those individuals' sole job was to deliver multiple kilograms of pills and powder per day to customers at prices and amounts set by GARCIA. The DTO was compartmentalized, and the runners did not communicate with the customers. The DTO used dedicated vehicles with hidden compartments procured specifically to facilitate the transportation and distribution. In addition to the size and scale of the operation, the drugs that were distributed were linked to at least one overdose death. *See* PSR ¶¶18-22. Furthermore, the Defendant employed significant phone discipline, with encrypted applications and dedicated phone lines used by the runners.

The amount of drugs seized from the DTO during the search warrants is truly astounding and warrants further specific description:

- In November 2022, the Massachusetts State Police investigation recovered over 60 kilograms of controlled substances, including fentanyl, methamphetamine and cocaine, and three firearms from a stash location controlled by the DTO. *See* PSR ¶¶14-15.

- When the former leader of the DTO, Pedro Lopez was arrested in May 2023 in a Honda Accord with a hidden compartment, approximately $40,000 cash was located, along with another kilogram of methamphetamine. *See* PSR ¶¶14-17.

- In July 2023, during the overdose investigation, over 300 grams of methamphetamine and firearm were recovered. *See* PSR ¶¶18-30.

- In October 2023, investigators conducted two controlled purchases from the Defendant himself, that totaled 3,500 grams of methamphetamine. *See* PSR ¶¶38-51.

- On November 1, 2023, at 363 Broadway investigators seized over 18 kilograms of fentanyl, 37 kilograms of methamphetamine, 7.7 kilograms of fentanyl analogue, and

- nearly a kilogram of cocaine. Along with the fentanyl and methamphetamine, another 30 kilograms of other controlled substances and cutting agents were also located. *See* PSR ¶58-71.
- On November 1, 2023, at 341 Western, investigators seized 1.4 kilograms of fentanyl and 1.8 kilograms of methamphetamine. *See* PSR ¶¶72-75.
- On November 6, 2023, during a second search at 341 Western Avenue, investigators located a clandestine drug laboratory, with multiple industrial-grade pill presses (including one which was a rotary style press capable of producing over 10,000 pills per hour). Also, within the same lab space, investigators located multiple storage bins filled with suspected fentanyl and methamphetamine compounds. In total the storage bins containing the suspected fentanyl and methamphetamine compounds weighed over 100 pounds. Over 700 grams of fentanyl and 3.7 kilograms of methamphetamine were sent for testing and confirmed by the laboratory. *See* PSR ¶¶77-86.

This is just about 200 kilograms of controlled substances. These 200 kilograms, of course, are but a sample of what the DTO had on hand in its inventory during the few days of seizures. When considered in the context of the dozens of kilograms that they manufactured in the clandestine lab and distributed on a weekly basis, the drug weight is truly staggering. This DTO rates among the prolific ever prosecuted in this District.

On a daily basis, the Defendant directed the distribution of multiple kilograms – tens of thousands of pills -- and generated thousands of dollars in cash. At least 20 kilograms per week is a fair estimate. Multiple cooperating witnesses described distributing dozens of kilograms of fentanyl, methamphetamine and cocaine in pill and powder form per week. *See* PSR ¶¶98-124. Extrapolating the DTO's operation and applying the average weights, there is no question that the DTO far exceeded even the highest threshold under the guidelines for drug weight for both fentanyl and methamphetamine every two weeks that the DTO was in operation. This drug weight, therefore, is multiple orders of magnitude beyond that contemplated by the guidelines.

Significantly, these were not pills that the DTO obtained from others and distributed. This was a vertically integrated operation. The Defendant brought manufacturing in house and built out a dedicated laboratory with high-end pharmaceutical grade equipment capable of keeping the

DTO well-stocked to meet the demand for counterfeit prescription pills. The dedicated manufacturing and storage premises distinguish the Defendant's DTO from nearly every other, and further supports the 19-year sentence being sought by the government.

Beyond the drug weight, this was also an extremely well-armed organization as well. In total, over 10 firearms were recovered during the various searches. This includes four firearms from the stash location alone.

Based on the nature of the crimes, a significant period of incarceration is called for. The Defendant has acknowledged this through the Plea Agreement and the sentencing range proposed by the Parties. This is also a sentence that acknowledges the Defendant's role as a leader of the DTO, and his acceptance of responsibility in pleading guilty without litigation, and promptly agreeing to the potential of up to two decades in prison. In short, the government's recommended sentence of 19 years properly accounts for this drug quantity, the manufacturing, firearms, and the Defendant's leadership of it all.

### B.     Criminal History, Specific Deterrence, Punishment

This case is the hard-earned capstone of the Defendant's criminal career. The Defendant's criminal history began in high school, with juvenile convictions for assault and battery and marijuana possession. *See* PSR ¶¶143-144. The Defendant was granted probation on these cases, but violated within a few months, and was committed to the Department of Youth Services.

When he turned eighteen, the Defendant accrued four serious cases in a matter of months: distribution of a class B substance (PSR ¶145), possession to distribute marijuana (PSR ¶146), and two counts of armed robbery (PSR ¶147), and assault and battery while detained pretrial (PSR ¶148). The armed robbery conviction bears further discussion.

In the robbery case, the Defendant agreed to sell a friend of the Defendant's an amount of

marijuana. During the deal, the Defendant and an accomplice pointed guns at the friend. The Defendant pushed the friend to the floor, and the accomplice put a gun to his head. The Defendant searched the friend's pockets, stealing a wallet, $675 cash, an iPhone and watch. The Defendant and the accomplice then went outside and got into the friend's car, and demanded items from a person who was in the car as well. A few days later, the Defendant was arrested with a loaded firearm. The Defendant received a 2-year state prison sentence, for this extremely serious case.

Strangely, this path was not thrust upon the Defendant. Unlike many offenders, the Defendant was raised in a middle-class two-parent home with hardworking parents. *See* PSR ¶160-173. Despite their positive example, the Defendant has basically never worked as an adult. Since his release from state prison, he supported himself and his girlfriend through drug dealing on a grand scale. Bank records reflect hundreds of thousands of dollars in cash deposits since 2021 into accounts held in the name of the Defendant and his girlfriend (PSR ¶¶95-98). Beyond the hundreds of thousands in cash that he deposited and used, the Defendant also admits to gambling away a literal fortune of his drug proceeds.[1]

Deterring a hardened offender such as the Defendant is a critical goal that must be accomplished and a lengthy prison term is the only means to do so. The Defendant must come to learn during a sufficiently lengthy term of imprisonment that drug dealing and gunplay simply are not acceptable. Context matters as well. Prior instances of leniency and probation only emboldened the Defendant and brought us to this point, where his crimes literally exceed what the guidelines contemplate. Consequently, this Court should sentence the Defendant at the top of the

---

[1] *See* PSR ¶176 ("As an adult, he went to Encore and Twin River Casino two or three times per week and spent hundreds or thousands of dollars, whatever he had on him. He also engaged in daily sports betting, spending hundreds or thousands of dollars on all types of sporting events.").

agreed-to sentencing range.

A nineteen-year sentence also serves the goal of punishing the Defendant and reflects the proper measure of punishment. Despite his criminal conduct over the years, a nineteen-year term represents a significant escalation of punishment. The sentence also reflects the extraordinary leap from armed robber to literal drug kingpin, whose product was directly linked to at least one overdose death.  Consequently, this sentence will have the desired effect of achieving a just punishment for his crimes.

        **C.**       **General Deterrence, Promotion of Respect for the Law, and Public Protection**

General deterrence and promotion of respect for the law must also be considered, and this Court should be mindful of the message that the sentence will send to drug dealers, gang members, and those who wield firearms while dealing drugs.  A sentence of nineteen years accomplishes all these goals of sentencing: general deterrence, public protection and promoting respect for the law.

To that end, a nineteen-year sentence sends a strong deterrent message to other drug dealers of what can be expected if they deal fentanyl and methamphetamine, carry firearms, and profit from the misery of persons addicted to controlled substances, all while killing others and destroying families and communities in this District.

Moreover, this Defendant is also well known in Lynn, both to gang members, and other drug offenders in the Boston area. His sentence and the sequence of federal involvement in this case will serve as an example and warning. It is a simple message: those who deal in fentanyl and methamphetamine can expect to face multiple decades in prison.  While the government and FBI's Northshore Gang Task Force has delivered substantial prison sentences against other leaders of large-scale DTOs and gangs in recent years, it appears that the deterrent message is now resounding online in videos and blogs, further deterring the small community of offenders in Lynn

that is responsible for drug distribution and gang violence.[2] This sentence will serve as another specific and salient example of the swift and sure punishment that awaits those who engage in drug dealing and expand their operations.

As a final point, the government wishes to be clear: had the Defendant not elected to promptly plead guilty to a serious sentence and demonstrated a willingness to accept responsibility and a justly deserved punishment, he could have expected to spend the remainder of his life in prison. Absent a willingness to plead guilty, a life sentence would be justly deserved and proportional to the criminal conduct in this case, which exponentially exceeds the drug weight contemplated by the guidelines and involved at least one documented overdose death. The acute potential for a life sentence, which the Defendant avoided through prompt acceptance of responsibility, is yet another layer to the message of deterrence achieved by this sentence.

This sentence called for by the government will also protect the public from this Defendant and the DTO for the foreseeable future. Lastly, the swiftly imposed 19-year sentence -- given the Defendant's acceptance of responsibility, uncontested detention, and willingness to plead guilty without any litigation -- certainly promotes respect for the law.

## CONCLUSION

Based upon the foregoing, the government requests that the Court impose a sentence of 228 months, followed by five years of supervised release.  Practically speaking, to accomplish the sentence of 228 months, the Court should impose a sentence of 168 months on Counts One and Two, followed by 60 months consecutive on Count Three.

---

[2] *See* e.g., https://www.youtube.com/watch?v=eNzdYbeYGAI, at 3:00 ("I've been saying it and I'm going to keep saying it until everyone hears me and gets out of the streets. The North Shore FBI Gang Task Force is dug in so deep into the area that they know who everyone is and what they do. They are not leaving and will only get stronger and gather more intelligence and continue to dismantle every organization in the region one by one.").

                                            Respectfully submitted,

                                            LEAH B. FOLEY,
                                            United States Attorney

By:    */s/ Philip A. Mallard*
        PHILIP A. MALLARD
        Assistant U.S. Attorney
        United States Attorney's Office
        1 Courthouse Way, Suite 9200
        Boston MA 02210
        617-748-3674

CERTIFICATE OF SERVICE

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF).

                                            */s/ Philip A. Mallard*
                                            PHILIP A. MALLARD
                                            Assistant U.S. Attorney

Date:   May 26, 2025